## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALEXIS RIVERA and VICTORIA ARVELO,** **as Parents & Natural Guardians of N.R., minor,** **and ALEXIS RIVERA and VICTORIA ARVELO, in their own right** 3209 N. Howard Street Philadelphia, PA 19140 **Plaintiffs,** v. **UNITED STATES OF AMERICA** **d/b/a Delaware Valley Community Health, Inc.** **and Maria de los Santos Health Center** **Defendant.** | **CIVIL ACTION** **NO.: _____** **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, Alexis Rivera and Victoria Arvelo, as parents and natural guardians on behalf of their minor daughter, N.R., and in their own right, hereby demand damages of Defendant in a sum in excess of the local arbitration limits, exclusive of interest, costs and damages for prejudgment delay, upon the causes of actions set forth below.  Plaintiffs allege as follows:

### JURISDICTION AND VENUE

1.      This case sounding in medical malpractice involves a claim for personal injury brought against the United States of America under Section (b)(1) of the Federal Tort Claims Act (FTCA) 28 U.S.C § 1346.  Jurisdiction is based on 28 U.S.C. § 1331 (Federal question) and Federal Tort Claims Act 28 U.S.C § 1346 et seq. (FTCA litigation), and 28 U.S.C. §1367 (Supplemental jurisdiction).

2.      On September 16, 2019, Plaintiffs placed the United States Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201 on notice of a "claim for damage, injury, or death" via Standard Form 95.  A copy of Plaintiffs' correspondence with completed Form 95 is attached hereto as Exhibit "A."

3.      On February 24, 2020, the Department of Health & Human Services denied the claim and via counsel, advised Plaintiffs that if they were dissatisfied with the determination, they had six (6) months to file suit against the United States.  A copy of correspondence from the Department of Health & Human Services is attached hereto as Exhibit "B."

4.      Venue is properly laid within the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2).  All acts and omissions that form the subject matter of this action occurred in this judicial district.

## THE PARTIES

5.      Plaintiffs, Alexis Rivera ("Alexis Rivera" or "Father-Plaintiff") and Victoria Arvelo ("Victoria Arvelo" or "Mother-Plaintiff"), are individuals and adult citizens of the Commonwealth of Pennsylvania, residing at 3209 N. Howard Street, Philadelphia, Pennsylvania 19140, and file this Complaint as parents and natural guardians of their minor daughter, N.R. ("NR" or "Minor-Plaintiff"), and in their own right.

6.      Minor-Plaintiff NR was born via cesarean section on September XX, 2017 at Temple University Hospital in Philadelphia, Pennsylvania.

7.      Defendant, United States of America ("United States") d/b/a Delaware Valley Community Health, Inc. ("DVCH") and its health center, Maria de los Santos Health Center ("MSHC") (hereinafter DVCH and its health center, MSHC, will collectively be referred to as "MSHC"), is a state-chartered health care facility.  MSHC is a Health Center Program grantee under 42 U.S.C. § 254b and a deemed Public Health Service Employee under 42 U.S.C. § 233(g)-(n).  MSHC is a state agency within the meaning of 28 U.S.C. § 2674.  MSHC maintains its principal place of business at 401 West Allegheny Avenue, Philadelphia, Pennsylvania 19133. MSHC includes obstetrician/gynecologist Clinton A. Turner, M.D. ("Dr. Turner") as an employee, actual agent, apparent agent, ostensible agent, workman, and servant.

8.     The claim asserted against Defendant United States in this action falls under the Federal Tort Claims Act and, as set forth more fully herein, is for the professional negligence of its employee, actual agent, apparent agent, ostensible agent, workman, and/or servant, Dr. Turner.

9.     In doing the acts alleged herein, Dr. Turner was acting as the actual agent, apparent agent, ostensible agent, and/or employee of Defendant United States.

10.     At all times material hereto, Victoria Arvelo and her unborn daughter, NR were under the medical care, treatment, and attendance of Defendant directly or through its agent, servant and/or employee Dr. Turner, and under its direct control or right of control.

11.     As a result of their negligent acts and omissions, Defendant and its agent, servant and/or employee, Dr. Turner, directly and proximately caused the injuries and damages described herein.

12.     A Certificate of Merit regarding the care rendered by the agent, servant and/or employee of Defendant United States is attached hereto as Exhibit "C."

13.     A Certificate of Merit regarding the care rendered by Dr. Turner is attached hereto as Exhibit "D."

14.     This case is a related action arising under the same set of facts against Temple University Hospital, Inc. d/b/a Temple University Hospital ("Temple University Hospital"), Temple University Health Systems, Inc., and Temple University Physicians, Inc. (collectively, "Temple Defendants"), currently docketed at Alexis Rivera, et al. v. Temple University Hospital, Inc., et al., C.A. No. 2:20-cv-00279-MAK.

## OPERATIVE FACTS

15.     On or about September 20, 2017, Victoria Arvelo was 30 years old and pregnant with her first child.

16.     Victoria Arvelo had received prenatal care for this pregnancy at MSHC.

17.     During the prenatal period, Victoria Arvelo was followed with ultrasounds for growth.   On or about August 11, 2017, when she was 34.2 days gestation, an ultrasound demonstrated normal growth, normal amniotic fluid, and the estimated fetal weight was in the 50th percentile, indicating that NR was growing normally.  A biophysical profile ("BPP") performed at that time was normal, indicating that NR was well-oxygenated.

18.     On or about September 6, 2017, at 38.2 weeks gestation, Victoria Arvelo underwent a non-stress test ("NST") that was read as reactive, demonstrating that NR was well-oxygenated.

19.     On or about September 10, 2017, at 38.6 weeks gestation, Victoria Arvelo underwent another NST that was read as reactive.

20.     On or about September 19, 2017, at 40.1 weeks gestation, Victoria Arvelo presented to Temple University Hospital for a follow-up ultrasound.  For the first time, her unborn daughter, NR, was found to be measuring smaller than expected, less than the 10th percentile of estimated fetal weight for that gestational age.  There was normal amniotic fluid volume.  Victoria Arvelo was sent to Temple University Hospital's Labor and Delivery unit for an induction of labor.

21.     At or about 1036 on September 19, 2017, Victoria Arvelo was placed on a fetal monitor on Labor and Delivery at Temple University Hospital.

22.     A history and physical authored by resident physician Molli I. Bascom, D.O. ("Dr. Bascom") reported that on admission, fetal monitoring revealed that the baby had a baseline heart rate of 135 beats per minute ("bpm"), with moderate variability and accelerations, assessed as a normal/Category I strip.  Contractions were noted to be irregular.  Victoria Arvelo's initial cervical examination was 1-2 cm dilated, 20% effaced, with the head at -3 station.  There was no evidence of maternal infection on physical exam, vital signs, or lab work.  The plan was to begin an induction of labor.  The history and physical was signed by attending Amanda L. Horton, M.D. ("Dr. Horton").

23.     At or about 1527, resident Holly Boyle, D.O. ("Dr. Boyle") authored a note where she described placing a Foley bulb to start the induction.  The cervical exam was listed as 2 cm dilated, 50% effaced, with the head at -3 station.  The fetal monitor tracing was read as Category I/normal, with a baseline rate of 130 bpm, moderate variability and accelerations.  Contractions were traced every 2-3 minutes.  The plan was to continue the induction with Pitocin, listed in Dr. Boyle's note as being administered at 6 mu/min.

24.     At or about 1546, Victoria Arvelo was positioned for an epidural.

25.     At or about 1756, attending Bethany Goins, D.O. ("Dr. Goins") assumed care of Victoria Arvelo.

26.     At or about 1807, Victoria Arvelo was evaluated by resident physician Dr. Bascom. The fetal monitor strip was read again as normal/Category I, with a baseline fetal heart rate of 130 bpm, moderate variability, and accelerations.  Contractions were noted every 2 minutes, and Pitocin was at 8 mu/min.  Victoria Arvelo's cervix was 5 cm dilated, 60% effaced, with the head at -3 station.  The Foley bulb was removed.

27.     At or about 2012, resident Kristin Kean, M.D. ("Dr. Kean") evaluated the fetal monitor strip as Category I/normal, with a baseline of 120 bpm, moderate variability and accelerations.

28.     At or about 2015, resident Olga Matveyevna Mutter, M.D. ("Dr. Mutter") artificially ruptured Victoria Arvelo's membranes.  The cervix was noted to be 6 cm, 60% effaced, with the head at -2 station.  The fetal heart rate was reported to be Category I/normal with a baseline of 130 bpm, with moderate variability and accelerations.  Contractions were every 1-2 minutes. The plan was to continue the Pitocin, now at 12 mu/min, and maintain the adequate uterine activity.

29.     At or about 0113 on September 20, 2017, Mother-Plaintiff was evaluated by resident Dr. Kean.  The cervix was reported to be 5 cm, 60% effaced, with the head at -1 station.

Dr. Kean assessed the fetal heart rate at Category I/normal, with a baseline of 130 bpm, moderate variability and accelerations. Pitocin was at 6 mu/min, and contractions were read as every 1-3 minutes. The plan was to continue the Pitocin and maintain the adequate uterine activity.

30.     At or about 0304, Dr. Goins examined Mother-Plaintiff. The cervix was still 5 cm dilated, 50% effaced, with the head at -3 station. The resident, Patricia Eliasinski, M.D. ("Dr. Eliasinski"), authored a note timed 0317 where she described the fetal monitor strip as having a baseline of 150 bpm, with subtle late decelerations. Dr. Goins performed scalp stimulation, and the strip improved. Contractions were described as being every 1-2 minutes. The plan was to continue to maintain the adequate uterine activity with Pitocin.

31.     At or about 0603, resident physician Katyayani Papatla, M.D. ("Dr. Papatla") evaluated Mother-Plaintiff. Temperature was 99.8˚F. Cervical exam was still 5 cm dilated, 60% effaced, with the head at -3 station. There had been no advancement in cervical dilation for approximately twelve (12) hours, even though the patient was on Pitocin and was contracting every 1-3 minutes. Dr. Papatla's note reports that the strip was Category I, with a baseline of 130s, moderate variability, accelerations and no decelerations. The plan was to continue Pitocin to maintain adequate uterine activity.

32.     In the morning of September 20, 2017, attending physician Dr. Turner took over Mother-Plaintiff's care from Dr. Goins. In a note timed 0914, he wrote that he examined Mother-Plaintiff, and found her to be 5 cm dilated, 80% effaced, with the head at -2 station, no change from the previous exam. By this point, there had been no change in Mother-Plaintiff's cervical exam in fifteen (15) hours. An intrauterine pressure catheter (IUPC) was placed, which revealed that Mother-Plaintiff was contracting every 1-2 minutes, with an adequate contraction pattern. Repetitive variable decelerations occurred, and the fetal heart rate baseline had increased to 150-160 bpm.

33.     At or about 0952, Micaela Fernandes, R.N. ("Nurse Fernandes") began an amnioinfusion through the pressure catheter.

34.     In a note timed 1002, Dr. Turner wrote that the patient was having variable decelerations with adequate contractions every two (2) minutes.  He discontinued the Pitocin and ordered IV hydration and amnioinfusion.  The plan was to "watch closely."

35.     At or about 1156, resident Dr. Boyle authored a note where she described the baseline fetal heart rate as in the 150s.  Although she wrote that the peak uterine contraction was 150 mm Hg, the resting tone was 20 mm Hg, she calculated the Montevideo units as 40-70. Pitocin was restarted.

36.     At or about 1400, Dr. Boyle authored a note where she described a Category II fetal heart rate tracing with a baseline in the 150s, with moderate variability and variable decelerations. The contraction pattern was documented to be adequate.  Mother-Plaintiff's cervix was dilated to 7 cm, 80% effaced, with the head at -1 station.

37.     At or about 1525, repetitive variable decelerations began to occur again.

38.     At or about 1549, resident Dr. Bascom reported that Mother-Plaintiff was 8-9 cm dilated, 100% effaced, with the head at 0 station.  She assessed the fetal monitor strip as showing a baseline in the 150s with moderate variability, and "intermittent variable and late decelerations." These findings are consistent with fetal hypoxemia.  The patient was put on her side and oxygen was administered.

39.     At or about 1554, Dr. Turner authored an attending attestation in which he detailed that the fetal heart rate had a baseline in the 140s with "intermittent" variable decelerations. However, the fetal heart rate monitoring actually demonstrated repetitive variable decelerations and late decelerations indicative of fetal hypoxemia.

40.     At or about 1639, Dr. Bascom placed a fetal scalp monitor due to decelerations v. dropout.

41.     Shortly after 1700, the fetal heart rate baseline, which had a baseline of 120s-130s at the start of the induction, began to demonstrate a tachycardic baseline in the 160s.  Repetitive decelerations continued with contractions, consistent with fetal hypoxemia.

42.     At or about 1758, Mother-Plaintiff's temperature was found to be 102.9° F, indicative of clinical chorioamnionitis, an intra-amniotic infection that can cause severe morbidity to the unborn baby.  Dr. Boyle ordered the administration of Ampicillin and Gentamicin.

43.     At or about 1811, Mother-Plaintiff was administered Tylenol to reduce her high fever and Ampicillin IV for partial coverage by Nurse Fernandes.  Although Gentamicin was ordered by Dr. Boyle, it was not administered for hours.

44.     At or about 1822, Dr. Turner acknowledged that Mother-Plaintiff's temperature was 102.9°F and diagnosed clinical chorioamnionitis.  His plan was to administer Ampicillin and Gentamicin, but as noted, only the Ampicillin was administered at this time.   He also acknowledged that there was fetal tachycardia that he termed "mild" with variable decelerations.

45.     The fetal heart rate remained tachycardic with decelerations.

46.     At or about 2025, Dr. Mutter evaluated Mother-Plaintiff and found her to be fully dilated.  Mother-Plaintiff's temperature continued to be elevated, and the baseline fetal heart rate remained tachycardic with decelerations.

47.     As Mother-Plaintiff began to push, deep variable decelerations began.  The fetal heart rate baseline increased to the 170s at or about 2050, and then the 180s.  Variable and late decelerations were present with contractions.

48.     Mother-Plaintiff's fetal heart rate strip was evaluated by Dr. Mutter at or about 2115.  The fetal heart rate baseline continued to climb to the 190s-200s, and variability decreased.

Variable and late decelerations were present with contractions.  This strip was consistent with worsening clinical chorioamnionitis and fetal hypoxemia.

49.     While the Gentamicin had been ordered by Dr. Boyle at or about 1806, it was not administered for almost four (4) hours.  Ann Levans, R.N. ("Nurse Levans") began infusing the Gentamicin at 2158 and did not finish infusing until 2228, approximately 20 minutes before the delivery.

50.     At or around 2215, Mother-Plaintiff spiked a temperature again to 102.3˚F.

51.     At or about 2225, Dr. Turner was documented to be at the bedside to evaluate the fetal monitor strip.  Over the course of three (3) hours, the fetal heart rate had developed worsening tachycardia, decreasing variability and worsening decelerations with late recovery.

52.     At or about 2248, Mother-Plaintiff delivered Minor-Plaintiff via spontaneous vaginal delivery.  The delivery note reports meconium was present, as well as a nuchal cord, and that there had been a "non-reassuring fetal testing."  The delivery was conducted by residents Dr. Kean and Dr. Mutter, under the supervision of Dr. Turner, the attending of record, who indicated in a note that he was present for the delivery.

53.     Minor-Plaintiff was born acidotic and severely infected.  She required resuscitation and had a one-minute AGPAR of 2.  Minor-Plaintiff's placenta was ultimately examined by pathology and showed extensive infection, with acute chorionitis and funisitis noted on microscopic examination.

54.     After a resuscitation, which included intubation, Minor-Plaintiff NR was transferred to Temple University Hospital's NICU and placed on a ventilator.

55.     Blood cultures were sent upon admission, which grew gram negative rods, ultimately identified as E. coli.

56.     Minor-Plaintiff NR was transferred to St. Christopher's Hospital for Children, where she underwent therapeutic hypothermia for hypoxic-ischemic encephalopathy.   She developed "overwhelming" sepsis and septic shock, respiratory failure, and permanent neurologic injuries, the full extent of which are not yet known.

57.     The negligence of the Defendant and its agent, as detailed herein, increased the risk of harm to Minor-Plaintiff NR.

58.     As a direct and proximate cause of the negligence of the Defendant and its agent, as detailed herein, Minor-Plaintiff NR suffered severe and permanent injuries.

59.     As a direct and proximate cause of the negligence of Defendant and its agent, as stated more fully herein, Minor-Plaintiff NR has suffered the following avoidable injuries and damages, the full extent of which is not yet known:

a.      Perinatal distress;

b.      Neonatal encephalopathy;

c.      Hypoxic ischemic encephalopathy;

d.      Hypoxic respiratory failure;

e.      Metabolic acidosis;

f.      Lactic acidosis;

g.      Sepsis;

h.      Septic shock;

i.      Candidemia;

j.      Coagulopathy;

k.      Acute kidney injury;

l.      Abnormal lab values;

m.      Meconium aspiration syndrome;

n.      Seizures;

o.      Post hemorrhagic hydrocephalus;

p.      Right adrenal hemorrhage;

q.      Adrenal insufficiency;

r.      Pulmonary hypertension;

s.      Feeding dysfunction;

t.      Hypertension;

u.      Hypotension;

v.      Developmental delay;

w.      Past and future pain and suffering;

x.      Past and future medical bills and expenses;

y.      Past and future loss of earning capacity;

z.      Past and future loss of life's pleasures;

aa.     Past and future emotional distress;

bb.     Past and future embarrassment;

cc.     Past and future disfigurement;

dd.     Past and future humiliation; and

ee.     Incidental expenses.

60.     As a direct and proximate cause of the negligence of the Defendant and its agent, as stated more fully herein, Minor-Plaintiff NR underwent the following procedures and medical treatments:

a.      Positive pressure ventilation;

b.      Intubation;

c.      Mechanical ventilation;

    d.       Administration of ECMO;

    e.       CPAP;

    f.       Umbilical catheterization;

    g.       Administration of pressors;

    h.       Gastrostomy tube placement;

    i.       G-tube feedings;

    j.       Transfusions;

    k.       Multiple blood draws;

    l.       Therapeutic hypothermia;

    m.       Extended NICU stay;

    n.       EEG;

    o.       Administration of medications;

    p.       MRI;

    q.       Head ultrasounds; and

    r.       Multiple therapeutic interventions and procedures during a prolonged NICU stay.

61.    Minor-Plaintiff NR's injuries were caused by the negligence of the Defendant and its agent, as set forth more fully below, and were not caused or contributed thereto by any negligence on the part of Alexis Rivera and/or Victoria Arvelo.

62.    Plaintiffs claim the full measure of damages recoverable for injuries and medical expenses on behalf of Minor-Plaintiff NR.

## COUNT I – MEDICAL PROFESSIONAL NEGLIGENCE

### PLAINTIFFS V. UNITED STATES

63.     The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

64.     At all times relevant hereto, Dr. Turner was the agent of United States.

65.     Defendant, United States, is liable for the negligent conduct of Dr. Turner, as stated below, pursuant to the principles of agency, vicarious liability and/or respondeat superior. Accordingly, the negligence of Dr. Turner is imputed to United States.

66.     The negligent acts and omissions of Dr. Turner consisted of one or more of the following:

a.     Failure to promptly and adequately evaluate and monitor Victoria Arvelo and her unborn daughter, Minor-Plaintiff NR, given the circumstances described above;

b.     Failure to properly manage Victoria Arvelo's labor so that she did not deliver an infant who was born hypoxic and with overwhelming sepsis;

c.     Failure to oversee all persons providing care to Victoria Arvelo during her labor and delivery;

d.     Failure to recognize and timely respond to signs of fetal hypoxemia on the fetal monitor strip;

e.     Failure to recognize and timely respond to non-reassuring features on the electronic fetal monitor strip;

f.     Failure to recognize and timely respond to a Category III strip;

g.     Failure to recognize and timely respond to signs of fetal acidemia on the fetal monitor strip;

h. Failure to recognize and timely respond to signs of fetal distress on the fetal monitor strip;

i. Failure to recognize and respond to absent variability;

j. Failure to timely and properly respond to fetal tachycardia;

k. Failure to ensure that all fetal resuscitation efforts were performed;

l. Failure to properly interpret the electronic fetal monitor tracing;

m. Failure to expedite delivery;

n. Failure to recognize and respond to fetal distress;

o. Failure to timely perform an emergent cesarean section;

p. Failure to timely deliver Minor-Plaintiff NR;

q. Failure to take steps to ensure Minor-Plaintiff NR was not delivered in an acidemic or hypoxemic state;

r. Failure to timely and properly treat chorioamnionitis;

s. Failure to ensure that Gentamicin was ordered and administered STAT;

t. Failure to ensure that Gentamicin was timely administered to Victoria Arvelo;

u. Failure to timely administer antibiotics with gram negative coverage to Victoria Arvelo;

v. Failure to take steps to reduce the risk of fetal sepsis;

w. Failure to take steps to reduce the risk of infection;

x. Failure to properly and timely perform in utero fetal resuscitation;

y. Failure to properly manage Victoria Arvelo's labor and delivery, given the circumstances above;

z. Failure to recognize and respond to the findings on the electronic monitor;

aa.    Failure to recognize and respond to Minor-Plaintiff NR's condition *in utero* and respond appropriately;

bb.    Failure to properly supervise/direct the care rendered by the nursing staff caring for Victoria Arvelo;

cc.    Failure to properly supervise/direct the care rendered by the residents caring for Victoria Arvelo;

dd.    Failure to recognize the significance of the tracing on the electronic fetal monitor and respond appropriately;

ee.    Failure to take proper measures to ensure Minor-Plaintiff NR's safety during the labor and delivery, including timely administration of antibiotics and timely delivery;

ff.    Failure to utilize due care in the management of Victoria Arvelo's labor and delivery to avoid injury to Minor-Plaintiff NR;

gg.    Failure to diagnose, recognize, and prevent the development of fetal infection; and

hh.    Failure to diagnose, recognize, and prevent the development of fetal acidosis.

**WHEREFORE**, Plaintiffs, Alexis Rivera and Victoria Arvelo, as parents and natural guardians on behalf of their minor daughter, NR, and in their own right, respectfully demand judgment against Defendant for sums in excess of the local arbitration limits, exclusive of interest, prejudgment interest and costs.

## COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**PLAINTIFFS, ALEXIS RIVERA AND VICTORIA ARVELO, IN THEIR OWN RIGHT
V. UNITED STATES**

67.     The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

68.     Plaintiffs, Alexis Rivera and Victoria Arvelo directly and contemporaneously witnessed, via sight and hearing, their daughter's heart rate rising and falling in the labor room.

69.     Plaintiffs, Alexis Rivera and Victoria Arvelo directly and contemporaneously witnessed the failure of Dr. Turner to respond to their daughter's abnormal heart rate.

70.     Plaintiffs, Alexis Rivera and Victoria Arvelo relied upon the representation of Dr. Turner that their daughter's heart rate abnormalities were not concerning.

71.     Plaintiffs, Alexis Rivera and Victoria Arvelo became aware at delivery when NR was born in critical condition there had been a failure of the labor team to respond.

72.     The failure of Dr. Turner to promptly respond to the fetal heart rate abnormalities, led to Minor-Plaintiff NR's condition at delivery.

73.     As a result of the negligent, tortious conduct and fault of Defendant, as well as its agent, servant and/or employee Dr. Turner, the Plaintiffs, Alexis Rivera and Victoria Arvelo, suffered sudden and intense shock, anxiety, panic and fear, manifested by an increase in heart rate and rapid breathing.

74.     As a result of the negligent, tortious conduct and fault of Defendant, as well as their agents, servants and/or employees specifically named herein Plaintiffs, Alexis Rivera and Victoria Arvelo, suffered mental anguish and distress, including, but not limited to, emotional distress, anxiety, depression and a sense of loss.

75.     Furthermore, Plaintiffs, Alexis Rivera and Victoria Arvelo, directly and contemporaneously witnessed Minor-Plaintiff NR's pain and suffering and other injuries, as described herein.

76.     The witnessing of the negligence and injury described herein caused to Minor-Plaintiff NR has caused Plaintiffs Alexis Rivera and Victoria Arvelo to suffer severe emotional shock, trauma and psychological injury.

77.     As a result of the emotional shock and trauma suffered by Plaintiffs Alexis Rivera and Victoria Arvelo as a result of Dr. Turner's negligence, Plaintiffs Alexis Rivera and Victoria Arvelo have experienced and continue to experience physical and/or emotional effects and/or manifestations of that emotional trauma and shock, including sleeplessness, anxiety, depression, flashbacks, nightmares, palpitations, shortness of breath and other symptoms, and will continue to so suffer in the future, and, therefore, are entitled to recover damages in their own right for physical injury and emotional pain and suffering under the law.

**WHEREFORE**, Plaintiffs, Alexis Rivera and Victoria Arvelo, as parents and natural guardians on behalf of their minor daughter, NR, and in their own right, respectfully demand judgment against Defendant for sums in excess of the local arbitration limits, exclusive of interest, prejudgment interest and costs.

Respectfully submitted,
**KLINE & SPECTER, P.C.**

Date:  March 18, 2020                    By: /s/Lisa S. Dagostino, M.D., J.D.
Shanin Specter, Esquire
Lisa S. Dagostino, Esquire
1525 Locust Street
Philadelphia, PA 19102

*Attorneys for Plaintiffs*

# Exhibit "A"

**to**

Plaintiffs' Civil Action Complaint

### KLINE & SPECTER PC
ATTORNEYS AT LAW
1525 LOCUST STREET
PHILADELPHIA, PENNSYLVANIA 19102
WWW.KLINESPECTER.COM

LISA S. DAGOSTINO, M.D., J.D., M.Be., LL.M.

LISA.DAGOSTINO@KLINESPECTER.COM

MAIN: 215-772-1000
DIRECT: 215-772-2488
FAX: 215-735-0957

September 16, 2019

**Fax # 202-619-2922**

<u>**Via Federal Express**</u>
<u>**& Email (HHS-FTCA-Claims@hhs.gov)**</u>

U.S. Department of Health and Human Services
Office of the General Counsel
General Law Division
Claims and Employment Law Branch
330 C Street, SW
Attention: CLAIMS
Switzer Building, Suite 2600
Washington, D.C., 20201

Re:     Notice of Tort Claim on behalf of Natalia Rivera, minor by and through her
        parents and natural guardians, Alexis Rivera and Victoria Arvelo
        v. Clinton A. Turner, M.D., Maria de Los Santos Medical Center,
        Delaware Valley Community Health, Inc., and the United States of America;
        (D.O.B.:  09/20/2017; Social Security No.: 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)

Dear Sir/Madam:

This firm represents Natalia Rivera, minor by and through her parents and natural guardians, Alexis Rivera and Victoria Arvelo, and in their own right.  I enclose an executed Standard Form 95 placing the United States Department of Health and Human Services ("HHS") on notice of a potential medical negligence claim.

Please direct all communications regarding this matter to my attention.

Very truly yours,

Lisa S. Dagostino

LSD:kms
Enclosure

cc:     Clinton A. Turner, M.D. (w/enclosure)
        Maria de Los Santos Medical Center (w/enclosure)
        Delaware Valley Community Health Inc. (w/ enclosure)

| CLAIM FOR DAMAGE, INJURY, OR DEATH | **INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | Alexis Rivera & Victoria Arvelo, as parents and natural guardians of Natalia Rivera, minor, and in their own right<br>3209 N. Howard St., Philadelphia, PA 19140<br>(See attached for personal rep.) |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 09/20/2017 | Single | 09/20/2017 | Wednesday | 10:48 P.M. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

SEE ATTACHED SHEET.

DEFENDANTS ARE: Clinton Turner, M.D.; Maria De Los Santos Health Center; Delaware Valley Community Health, Inc., and United States of America.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

N/A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

SEE ATTACHED SHEET.

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) | |
| SEE ATTACHED SHEET. | | |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| 0.00 | 40,000,000 | 0.00 | 40,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side) | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *Victoria [signature]* | 267-904-6855 | 09/16/2019 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

**STANDARD FORM 95** (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

| INSURANCE COVERAGE |
|---|

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

**15. Do you carry accident insurance?** ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☐ No

N/A

**16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?** ☐ Yes ☐ No   | **17. If deductible, state amount.**

N/A

0.00

**18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).**

N/A

**19. Do you carry public liability and property damage insurance?** ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☐ No

N/A

| INSTRUCTIONS |
|---|

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

| PRIVACY ACT NOTICE |
|---|

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A.   Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B.   Principal Purpose: The information requested is to be used in evaluating claims.
C.   Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D.   Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

| PAPERWORK REDUCTION ACT NOTICE |
|---|

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

**STANDARD FORM 95 REV. (2/2007) BACK**

**Continuation of Standard Form 95**
**Claim For Damage, Injury, or Death**

**2.**     **CLAIMANT'S REPRESENTATIVE IS:**

>    Lisa S. Dagostino, Esquire
>    KLINE & SPECTER, P.C.
>    1525 Locust Street
>    Philadelphia, PA  19102
>    215-772-1000 telephone
>    215-735-0957 facsimile
>    Lisa.Dagostino@KlineSpecter.com

**8.**     **BASIS OF CLAIM:**

Minor claimant, Natalia Rivera ("NR"), was born on September 20, 2017 at 10:48 P.M at Temple University Hospital in Philadelphia, Pennsylvania.  Claimants Alexis Rivera and Victoria Arvelo are the parents and natural guardians of their minor daughter, Natalia Rivera, and file this Form 95 on her behalf, and in their own right.

On September 20, 2017, Victoria Arvelo was 30 years old, and pregnant with her first child. During her pregnancy, Victoria Arvelo received her prenatal care at the Maria De Los Santos Health Center.

During her pregnancy, Victoria Arvelo was followed with ultrasounds for growth.  On August 11, 2017, when she was 34 weeks 4 days gestation, an ultrasound demonstrated normal growth, normal amniotic fluid, and the estimated fetal weight was in the 50th percentile, indicating that NR was growing normally. A biophysical profile ("BPP") performed at that time was normal, indicating that NR was well-oxygenated. On September 6, 2017, at 38.2 weeks gestation, Victoria Arvelo underwent a non-stress test ("NST") that was read as reactive, demonstrating that NR was well-oxygenated.  On September 10, 2017, at 38.6 weeks gestation, Victoria Arvelo underwent another NST that was read as reactive.

On September 19, 2017, at 40.1 weeks gestation, Victoria Arvelo presented to Temple University Hospital for a follow up ultrasound.  For the first time, her unborn daughter, NR, was found to be measuring smaller than expected, less than the 10th percentile of estimated fetal weight for that gestational age.  There was normal amniotic fluid volume.  Victoria Arvelo was sent to Temple University Hospital Labor and Delivery for an induction of labor.

At 1036 on September 19, 2017, Victoria Arvelo was placed on a fetal monitor on labor and delivery at Temple University Hospital. A history and physical authored by resident physician Dr. Molli Bascom reported that on admission, fetal monitoring revealed that the baby had a baseline heart rate of 135 beats per minute ("bpm"), with moderate variability and accelerations, assessed as a normal/Category I strip.  Contractions were noted to be irregular.  Victoria Arvelo's

initial cervical examination was 1-2 cm dilated, 20% effaced, with the head at -3 station. There was no evidence of maternal infection on physical exam, vital signs, or lab work. The plan was to begin an induction of labor. The history and physical was signed by attending Amanda L. Horton, M.D.

At 1527, Dr. Boyle authored a note where she described placing a Foley bulb to start the induction. The cervical exam was listed as 2 cm dilated, 50% effaced, with the head at -3 station. The fetal monitor tracing was read as Category I/normal, with a baseline rate of 130 bpm, moderate variability and accelerations. Contractions were traced every 2-3 minutes. The plan was to continue the induction with Pitocin, listed in Dr. Boyle's note as being administered at 6 mu/min. At 1546, Victoria Arvelo was positioned for an epidural. At 1756, attending Bethany Goins, D.O. ("Dr. Goins") assumed care of Victoria Arvelo.

At 1807, Victoria Arvelo was reevaluated by resident physician Dr. Bascom. The fetal monitor strip was read again as normal/Category I, with a baseline fetal heart rate of 130 bpm, moderate variability, and accelerations. Contractions were noted every 2 minute, and Pitocin was at 8 mu/min. Victoria Arvelo's cervix was 5 cm dilated, 60% effaced, with the head at -3 station. The Foley bulb was removed. At 2012, resident Dr. Kean evaluated the fetal monitor strip as Category I/normal, with a baseline of 120 bpm, moderate variability and accelerations.

At 2015, resident physician Dr. Olga Matveyevna Mutter artificially ruptured Victoria Arvelo's membranes. The cervix was noted to be 6 cm, 60% effaced, with the head at -2 station. The fetal heart rate was reported to be Category I/normal with a baseline of 130 bpm, with moderate variability and accelerations. Contractions were every 1-2 minutes. The plan was to continue the Pitocin, now at 12 mu/min, and maintain the adequate uterine activity.

At 0113 on September 20, 2017, Mother-Claimant was evaluated by resident physician Dr. Kirsten Kean. The cervix was reported to be 5 cm, 60% effaced, with the head at -1 station. Dr. Kean assessed the fetal heart rate at Category I/normal, with a baseline of 130 bpm, moderate variability and accelerations. Pitocin was at 6 mu/min, and contractions were read as every 1-3 minutes. The plan was to continue the Pitocin and maintain the adequate uterine activity.

At 0304, Dr. Goins examined Mother-Claimant. The cervix was still 5 cm dilated, 50% effaced, with the head at -3 station. Resident physician Patricia Eliasinski, M.D. authored a note timed 0317 where she described the fetal monitor strip as having a baseline of 150 bpm, with subtle late decelerations. Dr. Goins performed scalp stimulation, and the strip improved. Contractions were described as being every 1-2 minutes. The plan was to continue to maintain the adequate uterine activity with Pitocin.

At 0603, resident physician Katyayani Papatla, M.D. evaluated Mother-Claimant. Temperature was 99.8 F. Cervical exam was still 5 cm dilated, 60% effaced, with the head at -3 station. There had been no advancement in cervical dilation for approximately twelve (12) hours, even though the patient was on Pitocin and was contracting every 1-3 minutes. Dr. Papatla's note reports that the strip was Category I, with a baseline of 130s, moderate variability, accelerations and no decelerations. The plan was to continue Pitocin to maintain adequate uterine activity.

2

In the morning of September 20, 2017, attending physician Clinton Turner, M.D. assumed the overall responsibility for Mother-Claimant's care from Dr. Goins.  Upon information and belief, Dr. Turner provides obstetric care through the Maria De Los Santos Health Center, and is an employee of Delaware Valley Community Health, Inc and the United States of America. Claimants allege that Dr. Turner provided care to Victoria Arvelo on September 20, 2017 in conjunction with the resident physicians and nursing staff of Temple University Hospital, but as the overall attending physician, bore responsibility for the care rendered to her.

In a note timed 0914, Dr. Turner wrote that he examined Mother-Claimant, and found her to be 5 cm dilated, 80% with the head at -2 station, no change from the previous exam.  By this point, there had been no change in Mother-Claimant's cervical exam in fifteen (15) hours.  An intrauterine pressure catheter (IUPC) was placed, which revealed that Mother-Claimant was contracting every 1-2 minutes, with an adequate contraction pattern.  Repetitive variable decelerations occurred, and the fetal heart rate baseline had increased to 150-160 bpm.  No attempt was made to expedite delivery.

At 0952, Nurse Michaela Fernandes began an amnioinfusion through the pressure catheter. In a note timed 1002, Dr. Turner wrote that the patient was having variable decelerations with adequate contractions every two minutes.  He discontinued the Pitocin and ordered IV hydration and amnioinfusion.  The plan was to "watch closely." No attempt was made to expedite delivery.

At 1156, resident physician Dr. Holly Boyle authored a note where she described the baseline fetal heart rate as in the 150s.  Although she wrote that the peak uterine contraction was 150 mm Hg, the resting tone was 20 mm Hg, she calculated the Montevideo units as 40-70.  Pitocin was restarted.

At 1400, Dr. Boyle authored a note where she described a Category II fetal heart rate tracing with a baseline in the 150s, with moderate variability and variable decelerations.  The contraction pattern was documented to be adequate.  Mother-Claimant's cervix was dilated to 7 cm, 80% effaced, with the head at -1 station. At 1525, repetitive variable decelerations began to occur again.  No attempt was made to expedite delivery.

At 1549, resident physician Dr. Bascom reported that Mother-Claimant was 8-9 cm dilated, 100% effaced, with the head at 0 station.  She assessed the fetal monitor strip as showing a baseline in the 150s with moderate variability, and "intermittent variable and late decelerations." These findings are consistent with fetal hypoxemia.  The patient was put on her side and oxygen was administered.  No attempt was made to expedite delivery.

At 1554, Dr. Turner acknowledged in an attending attestation that the fetal heart rate had a baseline in the 140s with "intermittent" variable decelerations.  However, the fetal heart rate monitoring actually demonstrated repetitive variable decelerations and late decelerations indicative of fetal hypoxemia. At 1639, Dr. Bascom placed a fetal scalp monitor due to decelerations v. dropout.  No attempt was made to expedite delivery.

Shortly after 1700, the fetal heart rate baseline, which had a baseline of 120s-130s at the start of the induction, began to demonstrate fetal tachycardia, with a baseline in the 160s.

3

Repetitive decelerations continued with contractions, consistent with fetal hypoxemia. No attempt was made to expedite delivery.

At 1758, Mother-Claimant's temperature was found to be 102.9°F, indicative of clinical chorioamnionitis, an intra-amniotic infection that can cause severe morbidity to the unborn baby. Dr. Boyle ordered the administration of Ampicillin and Gentamicin. No attempt was made to expedite delivery.

At 1811, Mother-Claimant was administered Tylenol to reduce her high fever and Ampicillin IV for partial coverage by Nurse Fernandes. Although Gentamicin had been ordered by Dr. Boyle, it was not administered for hours.

At 1822, Dr. Turner acknowledged that Mother-Claimant's temperature was 102.9°F and diagnosed clinical chorioamnionitis. His plan was to administer Ampicillin and Gentamicin, but as noted, only the Ampicillin was administered at this time. He also acknowledged that there was fetal tachycardia that he termed "mild" with variable decelerations. No attempt was made to expedite delivery.

The fetal heart rate continued to be tachycardic with decelerations, a non-reassuring fetal monitoring strip.

At 2025, Dr. Mutter evaluated Mother-Claimant and found her to be fully dilated. Mother-Claimant's temperature continued to be elevated, and the baseline fetal heart rate remained tachycardic with decelerations. No attempt was made to expedite delivery.

As Mother-Claimant began to push, deep variable decelerations began, indicating further fetal compromise. The fetal heart rate baseline increased to the 170s at or about 2050, and then the 180s. Variable and late decelerations were present with contractions.

Mother-Claimant's fetal heart rate strip was re-evaluated by Dr. Mutter at or about 2115. The fetal heart rate baseline continued to climb to the 190s-200s, and variability decreased. Variable and late decelerations were present with contractions. This strip was consistent with worsening clinical chorioamnionitis and fetal hypoxemia. No attempt was made to expedite delivery.

While the Gentamicin had been ordered by Dr. Boyle at or about 1806, it was not administered for almost four (4) hours, depriving Victoria Arvelo and her unborn daughter, NR, of needed antibiotic coverage for gram negative bacteria during that time. Nurse Ann Levans began infusing the Gentamicin at 2158 and did not finish infusing until 2228, approximately 20 minutes before the delivery.

At or around 2215, Mother-Claimant spiked a temperature again to 102.3°F.

At or about 2225, Dr. Turner was documented to be at the bedside to evaluate the fetal monitor strip. Over the course of three (3) hours, the fetal heart rate had developed worsening

tachycardia, decreasing variability and worsening decelerations with late recovery. No attempt had been made during this time to expedite delivery.

At or about 2248, Mother-Claimant delivered Minor-Claimant via spontaneous vaginal delivery. The delivery note reports meconium was present, as well as a nuchal cord, and that there had been "non-reassuring fetal testing." The delivery was conducted by residents Dr. Kean and Dr. Mutter. Dr. Turner, the attending of record, indicated in a note that he was present for the delivery and assisted.

Minor-Claimant NR was born acidotic and severely infected. She required resuscitation and had a one-minute AGPAR of 2. Minor-Claimant's placenta was ultimately examined by pathology and showed extensive infection, with acute chorioamnionitis and funisitis noted on microscopic examination.

After a resuscitation, which included intubation, Minor-Claimant NR was transferred to Temple University Hospital's NICU and placed on a ventilator. Blood cultures were sent upon admission, which grew gram negative rods, ultimately identified as E. coli.

Minor-Claimant NR was transferred to St. Christopher's Hospital for Children, where she underwent therapeutic hypothermia for hypoxic-ischemic encephalopathy. She developed "overwhelming" sepsis and septic shock, respiratory failure, and severe permanent neurologic injuries, the full extent of which are not yet known due to her young age. These injuries will result in life-long physical and emotional damages.

Dr. Turner's failure to expedite delivery in the face of an arrest of labor and a non-reassuring fetal monitor tracing deprived minor-claimant NR of oxygen and caused her to be born acidotic. His failure to ensure that Victoria Arvelo was timely administered a needed antibiotic, gentamicin, with coverage for gram negative organisms caused minor-claimant to be born severely septic. As a direct and proximate cause of the negligence of the Dr. Turner and his agents, as detailed herein, Minor-Claimant NR suffered severe and permanent injuries. The negligence of the Defendants and their agents also increased the risk of harm to Minor-Claimant NR.

## 10.   NATURE AND EXTENT OF EACH INJURY:

As a direct and proximate cause of the negligence of Defendants and their agents Minor-Claimant NR has suffered the following avoidable injuries and damages, the full extent of which is not yet known: perinatal distress; neonatal encephalopathy; hypoxic ischemic encephalopathy; hypoxic respiratory failure; metabolic acidosis; lactic acidosis; sepsis; septic shock; candidemia; coagulopathy; acute kidney injury; abnormal lab values; meconium aspiration syndrome; seizures; post hemorrhagic hydrocephalus; right adrenal hemorrhage; adrenal insufficiency; pulmonary hypertension; feeding dysfunction; hypertension; hypotension; developmental delay; past and future pain and suffering; past and future medical bills and expenses; past and future loss of earning capacity; past and future loss of life's pleasures; past and future emotional distress; past and future embarrassment; past and future disfigurement; past and future humiliation; and incidental expenses.

5

As a direct and proximate cause of the negligence of Defendants and their agents, as stated more fully herein, Minor-Claimant NR underwent the following procedures and medical treatments: Positive pressure ventilation; Intubation; Mechanical ventilation; Administration of ECMO; CPAP; Umbilical catheterization; Administration of pressors; Gastrostomy tube placement; G-tube feedings; Transfusions; Multiple blood draws; Therapeutic hypothermia; Extended NICU stay; EEG; Administration of medications; MRI; Head ultrasounds; and Multiple therapeutic interventions and procedures during a prolonged NICU stay.

In addition, claimants Alexis Rivera and Victoria Arvelo were caused to suffer emotional distress resulting in physical manifestations that include panic attacks, anxiety, depression, sleep disturbances, and nightmares.

Claimants' injuries were caused solely by the negligence of the Defendants and their agents and were not caused or contributed thereto by any negligence on the part of Alexis Rivera and/or Victoria Arvelo.

Claimants' claim the full measure of damages recoverable for medical expenses on behalf of Minor-Claimant NR.

11.   **WITNESSES KNOWN AT THIS TIME:**

Alexis Rivera (father) and Victoria Arvelo (mother)
3209 North Howard Street
Philadelphia, PA 19140

Danielle Flynn, R.N.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Molli I. Bascom, D.O.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Amanda L. Horton, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Sylvia Jordan, R.N.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

6

Holly Boyle, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Kellie Simmons, C.R.N.P.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Bethany Goins, D.O.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Kristin Kean, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Olga Matveyevna Mutter, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Patricia Eliasinski, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Katyayani Papatla, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Bok Chun, R.N.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Micaela Fernandes, R.N.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

7

Clinton A. Turner, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Ann Levans, R.N.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Jessica Reardon, D.O.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Kathleen Tyson, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Diana Feinstein, D.O.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Sumita Bhambhani, M.D.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

Stephen McCaughan, D.O.
%Temple University Hospital, Inc. d/b/a Temple University Hospital
3401 North Broad Street
Philadelphia, PA 19140

# Exhibit "B"

**to**

Plaintiffs' Civil Action Complaint



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the General Counsel
General Law Division

FEB 2 4 2020

330 C Street, SW
Switzer Building – Suite 2100
Washington, DC 20201

**CERTIFIED–RETURN
RECEIPT REQUESTED**

Lisa S. Dagostino, M.D., Esq.
Kline & Specter PC
1525 Locust Street
Philadelphia, PA 19102

Re:  **Administrative Tort Claim of Alexis Rivera, Victoria Arvelo, and N.R.
Claim Number 2019-0729**

Dear Dr. Dagostino:

On September 16, 2019, the Department of Health and Human Services ("HHS") received the above-referenced administrative claim filed under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680, alleging personal injury to N.R. as the result of medical care rendered by healthcare providers at Temple University Hospital in Philadelphia, Pennsylvania.

The Federal Tort Claims Act authorizes the settlement of any claim of money damages against the United States for, *inter alia*, injury caused by the negligent or wrongful act or omission of any employee of the federal government, while acting within the scope of employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 2672.

This letter constitutes the notice of final determination of the above-referenced administrative claim, as required by 28 U.S.C. §§ 2401(b) and 2675(a). The administrative tort claim of Alexis Rivera, Victoria Arvelo, and N.R. is denied. The evidence fails to establish that the alleged injuries were due to the negligent or wrongful act or omission of a federal employee acting within the scope of employment.

If your clients are dissatisfied with this determination, they are entitled to:

1. File a written request with the agency for reconsideration of the final determination denying the claim within six (6) months from the date of mailing of this determination (28 C.F.R. § 14.9); or

Lisa S. Dagostino, M.D., Esq.                                                        Page 2 of 2

2.  File suit against the United States in the appropriate federal district court within six (6) months from the date of mailing of this determination (28 U.S.C. § 2401(b)).

In the event that your client requests reconsideration, the agency will review the request within six (6) months from the date the request is received.  If the reconsidered claim is denied, your client may file suit within six (6) months from the date of mailing the final determination.

Very truly yours,

Jennifer B. Smith (bg jca)

Jennifer B. Smith
Acting Deputy Associate General Counsel
Claims and Employment Law Branch

# Exhibit "C"

**to**

Plaintiffs' Civil Action Complaint

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALEXIS RIVERA and VICTORIA ARVELO,** **as Parents & Natural Guardians of N.R., minor,** **and ALEXIS RIVERA and VICTORIA** **ARVELO, in their own right** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| v. | **NO.: _____** |
| **UNITED STATES OF AMERICA** **d/b/a Delaware Valley Community Health, Inc.** **and Maria de los Santos Health Center** **Defendant.** | **JURY TRIAL DEMANDED** |

**CERTIFICATE OF MERIT AS TO:**
**UNITED STATES OF AMERICA**

I, Lisa S. Dagostino, Esquire, certify that:

☐ an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by this medical provider in the treatment, practice or work that is the subject of the Complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm;

AND/OR

☒ the claim that this medical provider deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this medical provider is responsible deviated from an acceptable professional standard and an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the other licensed professionals in the treatment, practice or work that is the subject of the

Complaint, fell outside acceptable professional standards and that such conduct was a cause

in bringing about the harm;

OR

☐    expert testimony of an appropriate licensed professional is unnecessary for prosecution of

the claim against this medical provider.

Respectfully submitted,
**KLINE & SPECTER, P.C.**

Date: <u>March 18, 2020</u>         By: <u>/s/Lisa S. Dagostino, M.D., J.D.</u>
                                     Shanin Specter, Esquire
                                     Lisa S. Dagostino, Esquire
                                     1525 Locust Street
                                     Philadelphia, PA 19102
                                     *Attorneys for Plaintiffs*

2

# Exhibit "D"

**to**

Plaintiffs' Civil Action Complaint

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALEXIS RIVERA and VICTORIA ARVELO,** **as Parents & Natural Guardians of N.R., minor,** **and ALEXIS RIVERA and VICTORIA** **ARVELO, in their own right** **Plaintiffs,** | **CIVIL ACTION** |
| v. | **NO.: _____** |
| **UNITED STATES OF AMERICA** **d/b/a Delaware Valley Community Health, Inc.** **and Maria de los Santos Health Center** **Defendant.** | **JURY TRIAL DEMANDED** |

**CERTIFICATE OF MERIT AS TO:**
**CLINTON A. TURNER, M.D.**

I, Lisa S. Dagostino, Esquire, certify that:

☒    an appropriate licensed professional has supplied a written statement to the undersigned

that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by

this medical provider in the treatment, practice or work that is the subject of the Complaint,

fell outside acceptable professional standards and that such conduct was a cause in bringing

about the harm;

AND/OR

☐    the claim that this medical provider deviated from an acceptable professional standard is

based solely on allegations that other licensed professionals for whom this medical

provider is responsible deviated from an acceptable professional standard and an

appropriate licensed professional has supplied a written statement to the undersigned that

there is a basis to conclude that the care, skill or knowledge exercised or exhibited by the

other licensed professionals in the treatment, practice or work that is the subject of the

Complaint, fell outside acceptable professional standards and that such conduct was a cause

in bringing about the harm;

OR

☐    expert testimony of an appropriate licensed professional is unnecessary for prosecution of

the claim against this medical provider.

Respectfully submitted,
**KLINE & SPECTER, P.C.**

Date: <u>March 18, 2020</u>       By: <u>/s/Lisa S. Dagostino, M.D., J.D.</u>
                            Shanin Specter, Esquire
                            Lisa S. Dagostino, Esquire
                            1525 Locust Street
                            Philadelphia, PA 19102
                            *Attorneys for Plaintiffs*

2